IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.   2:21-CR-49-MHT-JTA-1 |
| | ) | |
| WILLIAM LEE HOLLADAY, III | ) | |

**MOTION IN LIMINE TO PROVISIONALLY ADMIT DOCUMENTS AND
TESTIMONY TO BE PROVIDED BY E. SHANE BLACK, ESQ. AND MOTION FOR
EXPEDITED REVIEW**

Comes now the United States of America, by and through Verne H. Speirs, Attorney for

the United States acting under authority conferred by 28 U.S.C. § 515, and submits this motion

in limine.  The government asks the Court to issue an order ruling that the following evidence is

provisionally admissible at the trial to be held in this matter: (1) testimony from E. Shane Black,

Esq. regarding, among other things, legal advice he gave to Defendant William Lee Holladay, III

(hereinafter, "Trey Holladay"); and (2) documents to be provided to the government by Black

pursuant to a trial subpoena, some of which may consist of written communications between

Black and Trey Holladay.[1]  For the reasons stated below, the government also requests that the

Court rule on this motion expeditiously.

## I. BACKGROUND

The following provides a short summary of the factual and procedural events relevant to

this motion.

### A.    Indictment and Not Guilty Pleas

On January 13, 2021, the grand jury returned a 127-count indictment against Defendants

Trey Holladay; Deborah Irby Holladay (hereinafter, "Deborah Holladay"); William Richard

---

[1]Unless otherwise stated, the remainder of this motion refers to the testimony that Black will provide and
the documents he will produce as collectively, "the Black materials."

Carter, Jr.; Gregory Earl Corkren; David Webb Tutt; and Thomas Michael Sisk.  Doc. 1.  In count one, the indictment charges all defendants with conspiring to commit mail and wire fraud, in violation of 18 U.S.C. § 371.  Id. at 16–61, ¶¶ 60–256.  Counts 2 through 78 charge Trey Holladay and Carter with substantive wire fraud offenses, each in violation of 18 U.S.C. § 1343.  Id. at 61–65, ¶¶ 257–61.  Similarly, in counts 79 through 83, the indictment alleges wire fraud offenses against Trey Holladay, Deborah Holladay, and Carter.  Id. at 66–67, ¶ 262.  Next, each of counts 84 through 92 contains a wire fraud charge against either Trey Holladay, Deborah Holladay, or Carter.  Id. at 67–92, ¶ 263.  Finally, counts 93 through 127 charge aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  Id. at 72–76, ¶¶ 264–65.  Specifically, count 93 charges Trey Holladay, Carter, and Corkren and counts 94 through 127 allege offenses against only Trey Holladay and Carter.  Id.

The indictment generally alleges a scheme whereby public school superintendents, Trey Holladay (the superintendent of the Athens, Alabama City School District (ACS), see id. at 1, 3–5, ¶ 1, 7–15) and Sisk (the superintendent of the Limestone County, Alabama School District (LCS), see id. at 3, 5–6, ¶ 6, 16–18), caused identifying and educational information pertaining to full-time private school students to be inputted into their respective districts' student enrollment databases so that the private school students appeared as public virtual school students, see generally id. at 20–28, 43–44, ¶¶ 74–105, 171–75.[2]  To obtain the student information, the superintendents offered and caused to be offered various benefits to administrators at various private schools, including: laptop computers, access to online courses, increased internet capabilities, standardized testing, and monetary payments.  Id. at 19, ¶ 70.

_____

[2]The indictment alleges that both ACS and LCS falsely reported private school students during the 2016–2017 school year.  Doc. 1 at 20–28, ¶¶ 74–105.  For the 2017–2018 school year, the indictment alleges that ACS and another school district, the Conecuh County School District (CCS) engaged in the false reporting of private school students.  Id. at 43–44, 39–49, ¶¶ 156–63, 171–75.

As a result of the false reporting of the private school students, when the Alabama State Department of Education (ASDE) looked at those databases to determine what per pupil funding the state owed the districts, the ASDE calculated amounts that were greater than the districts would have been entitled to receive had their enrollment numbers been accurate.  Id. at 29, 44–45, ¶¶ 111–14, 176–80.

The indictment goes on to allege that, after the state paid to ACS proceeds of the fraud, Trey Holladay, Carter (the ACS administrator tasked with overseeing ACS's virtual school, see id. at 2, ¶ 3), and Deborah Holladay each received, for their own personal use, portions of those proceeds.  Id. at 33–35, 56–60, ¶¶ 131–44, 231–51.  The defendants obtained these monies through a series of transactions that involved: (1) payments from ACS to a company owned by co-defendant Corkren; (2) cash payments by Corkren to Trey Holladay, Carter, and a company owned by co-defendant Tutt; (3) payments by Tutt to a company owned by Deborah Holladay; and (4) transfers made by Deborah Holladay from her company's accounts to personal accounts belonging to her and her husband, Trey Holladay.  See id.[3]

On March 4, 2021, each defendant appeared before a magistrate judge and pleaded not guilty to all counts.  Doc. 80 (Trey Holladay); Doc. 81 (Deborah Holladay); Doc. 82 (Carter); Doc. 83 (Corkren); Doc. 84 (Tutt); Doc. 85 (Sisk).

**B.     Guilty Pleas of Co-Defendants**

Thereafter, on April 8, 2021, Defendants Corkren, Tutt, and Sisk changed their pleas. Doc. 106 (Sisk); Doc. 110 (Corkren); Doc. 114 (Tutt).  All three defendants pleaded guilty to the

---

[3]Additionally, the indictment alleges that co-defendant Sisk received a cut of the proceeds after Corkren, at the direction of Sisk, made a payment to a charity and the charity then transferred most of the money it had received from Corkren to Sisk's personal account.  Doc. 1 at 35, ¶¶ 144–45.

conspiracy offense alleged in count one.  See id.  Additionally, Corkren entered a guilty plea to the count of aggravated identity theft charged in count 93.  Doc. 110.

**C.      Scheduling of Trial**

Meanwhile, Trey Holladay, Deborah Holladay, and Carter elected to proceed to trial.  On May 21, 2021, the Court scheduled the trial of the remaining defendants to begin on February 7, 2022.  Doc. 133.

**D.      Issuance of Subpoena to E. Shane Black**

On June 10, 2021, Special Agent Chris Maisano of the United States Department of Education – Office of Inspector General electronically served a subpoena on E. Shane Black.

As far as the government is aware, during all times relevant, Black was an attorney retained by the Athens Board of Education (Athens BOE) and tasked with providing legal advice and representation to the Board of Education and to ACS employees.  Among those employees was the superintendent, Trey Holladay.

The subpoena required Black to appear to testify at the February 7, 2022 trial.  See Att. 1 (Subpoena) at 1.  The attachment to the subpoena also requested from Black certain documents. Id. at 3.  Specifically, the attachment stated:

> You must also bring with you the following documents, electronically stored information, or objects spanning from July 1, 2015-December 31, 2018:
>
> All documents of any sort in your possession pertaining to: (1) cooperation between Athens City Schools (ACS) (or any employee of ACS) and any non-public school; (2) enrollment in Athens Renaissance School; (3) efforts to establish Alabama Renaissance School; (4) communications with the Alabama State Department of Education (ASDE) regarding funding for ACS or enrollment in ACS; (5) funding for the construction of the new campus of Athens High School; (6) the purchase of computer equipment by ACS between 2015 and 2018; (7) Educational Opportunities and Management, LLC; (8) Tutt Educational Services, LLC; (9) Sage Professional Development, LLC; (10) Integra Ventures, LLC; (11) the establishment of an ACS facility in Marengo County, Alabama; (12) Marengo Academy; (13) Jackson Academy; (14) Pickens Academy; (15) the Lakeside

School; (16) Southern Academy; (17) Monroe Academy; (18) Conecuh County, Alabama School District; (19) Meadowview Christian School; (20) Abbeville Christian Academy; and (21) Marion Academy.

Id. at 3.

The government anticipates that at least a portion of the Black materials pertain to or consist of otherwise-privileged communications between Black and ACS employees or board members whom he represented. See Doc. 159 at 1, ¶ 2. Some of those privileged communications are between Black and Trey Holladay.

**E.   Notification and Trey Holladay's Assertion of Privilege**

On July 12, 2021, the government electronically sent a letter to the attorneys for Trey Holladay, Deborah Holladay, and Carter. See Att. 2 (July 12, 2021 Letter). In that letter, the government advised the attorneys of the issuance of the subpoena to Black. Id.

On July 15, 2021, the attorney for Trey Holladay sent, via electronic mail, a letter to Black. See Att. 3 (July 15, 2021 Letter). The attorney copied the government and a different attorney for ACS and the Athens BOE, David McKnight. The letter stated, "We have been informed by the Government that you have been subpoenaed. This letter is to inform you that at this time, Dr. Holladay does not waive his attorney-client privilege concerning his communications and dealings with you." Id.

**F.   ACS's Motion for Protective Order**

On September 9, 2021, the government and the Athens BOE filed a joint motion for a protective order pursuant to Rule 502(d) of the Federal Rules of Evidence. Doc. 159. In that motion, the parties informed the Court of the existence of the subpoena and the Athens BOE stated that it wished "to cooperate with the Government's subpoena request." Id. at 1, ¶¶ 1, 4. The motion requested that the Court enter a protective order authorizing Black to comply with

the subpoena without Athens BOE being deemed to have waived its privilege in any other matter.  Id. at 2, ¶¶ 7–8.  In the motion, the parties stated that "the Board is sole and exclusive holder of the privilege with respect to the Privileged Information, and as such, the Board may authorize the disclosure of the Privileged Information, and Black may disclose it, to the extent and in the manner [requested by the parties]."  Id. at 2, ¶ 6.

Attached to the motion was an affidavit signed by the president of the Athens BOE, Beverly Malone.  See Doc. 159-2.  In that affidavit, Malone stated that she was authorized by the board to "authorize the disclosure of the privileged material."  Id. at 2.

The Court did not seek a response from the defendants and no defendant filed a response to the joint motion.

On September 13, 2021, the Court granted the joint motion and entered the proposed protective order.  Doc. 160.  The order contained the above-quoted language regarding the Athens BOE being the "sole and exclusive holder of the privilege."  Id. at 2, ¶ 2.  The order went on to: (1) require Black to produce "Privileged Documents to the Government"; and (2) provide "the Privileged Testimony in this federal case."  Id. at 2, ¶ 3.  Additionally, the order authorized Black to produce to the government the privileged materials and to discuss with government agents privileged communications "prior to the trial of this case."  Id.

On September 15, 2021, government attorneys spoke with an attorney representing Trey Holladay.  That attorney stated that, at this time, Trey Holladay does not intend to seek reconsideration of the magistrate judge's September 13, 2021 protective order and that Trey Holladay persists in his assertion of an attorney-client privilege protecting his communications with Black.

## II. THE RELIEF REQUESTED

Absent a valid waiver, testimony or documents containing the contents of communications protected by attorney-client privilege are inadmissible. See LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1265 (11th Cir. 2005) (identifying the "clear inadmissibility" of a letter from a client to his attorney); see also United States v. Rodriguez-Martin, No. CR 08-70-E, 2009 WL 10708285, *5 (N.D. Ala. Feb. 4. 2009) ("A letter from an attorney to his or her client is generally privileged and inadmissible."); Saridakis v. S. Broward Hosp. Dist., No. 08-62005-CIV-ALTONAGA/Brown, 2010 WL 11504762, *2 (S.D. Fla. Jan. 15, 2010) ("Any evidence regarding attorney-client privileged communications is inadmissible, as no waiver has been demonstrated to have taken place."); cf. United States v. Zolin, 491 U.S. 554, 566–67, 109 S. Ct. 1619, 2628 (1989) (a district court may conduct an in camera review of materials subject to a claim of privilege to determine whether those materials are subject to the crime-fraud exception and therefore not inadmissible).

Accordingly, for the government to introduce in its case-in-chief the Black materials, such evidence must: (1) not be presently subject to any non-waived privilege; and (2) otherwise admissible under the Federal Rules of Evidence, see, e.g., Fed. R. Evid. 401–402 (relevance); Fed. R. Evid. 801–804 (hearsay).

The government asks the Court to rule on the threshold privilege issue and enter an order holding that the evidence at issue is provisionally admissible, provided its admission is not prohibited by a provision of the Federal Rules of Evidence not associated with privileges. Because the government has not yet received the documents or had its agents interview Black, it is not yet able to provide a summary of the materials such that the Court is able to rule on other

admissibility issues associated with the Black materials.[4]  Nevertheless, a ruling as to whether or not Trey Holladay has any privilege to assert will permit the government to obtain the requested information and then return to the Court and ask the Court to rule on any additional issues that might arise from the government's seeking to admit such evidence.[5]

## III. WAIVER

As explained below, the Athens BOE waived an attorney-client privilege between its employees and Black.  Trey Holladay, an employee of the Athens BOE, has no privilege to claim after the board's action.

### A.    Legal Principles

"Questions of attorney-client privilege . . . are governed by federal common law."  In re Grand Jury Proceedings 88-9 (MIA), 899 F.2d 1039, 1044 (11th Cir. 1990); see Hancock v. Hobbs, 967 F.2d 462, 466 (11th Cir. 1992); Fed. R. Evid. 501. "The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential."  United States v. Schaltenbrand, 930 F.2d 1554, 1562 (11th Cir. 1991).[6]

---

[4]The government is reluctant to obtain such documents or have its agents speak with Black until the Court resolves the privilege issue.  As stated below, the government does not believe that Trey Holladay has any privilege to assert.  Nevertheless, should the Court decide the issue differently, the government does not want to have breached the privilege by the time the Court rules on the issue.

Additionally, the Court has already determined that the Athens BOE is the sole holder of the privilege and that the board has validly waived such privilege.  See Doc. 160 at 2, ¶ 2.  It is arguable that Trey Holladay's failure to seek reconsideration of the magistrate judge's order is an implicit abandonment of his earlier assertion of privilege.  Nevertheless, in an abundance of caution, the government seeks this order in limine.

[5]Defendants Deborah Holladay and Carter were, at relevant times, ACS employees.  However, despite receiving ample notice of the government's subpoena, neither has asserted any privilege.  Accordingly, the following addresses only Trey Holladay's claim of privilege.

[6]It is unlikely all of the materials requested by the subpoena fall under the attorney-client or a related attorney-work-product privilege.  "In order to show that communications made to an attorney are within the privilege, it must be shown that the communication was made to him confidentially, in his professional capacity, for the purpose of securing legal advice or assistance."  Schaltenbrand, 930 F.2d at 1562 (quotation marks omitted).  As for the work-product doctrine, "to be shielded from discovery the document must be (1) produced by an attorney or

The Supreme Court has long recognized that corporate entities are eligible to assert attorney-client privilege.  See Upjohn Co. v. United States, 449 U.S. 383, 389–90, 101 S. Ct. 677, 682–83 (1981) (describing the history of the attorney-client privilege and the "complications in the application of the privilege [that] arise when the client is a corporation, which in theory is an artificial creature of the law, and not an individual") (citing United States v. Louisville & Nashville R. Co., 236 U.S. 318, 336, 35 S. Ct. 363, 369 (1915)); see also United States v. Davita, Inc., 301 F.R.D. 676, 681 (N.D. Ga. 2014) ("It has long been determined that corporations are entitled to invoke the attorney-client privilege.").  In Upjohn Co. v. United States, the Court held as privileged communications made by a corporation's employees "to counsel for [the company] acting as such, at the direction of corporate superiors in order to secure legal advice from counsel."  449 U.S. at 394, 101 S. Ct. at 685.[7]

---

her agent and (2) created in anticipation of litigation." Adams v. City of Montgomery, 282 F.R.D. 627, 633 (M.D. Ala. 2012).

    Given that the government is unaware of the nature or contents of the Black materials, it is unable to make arguments about whether such materials satisfy either of the above-described privileges.  Were the Court to determine that Trey Holladay holds some privilege with respect to his communications with Black, the government would request that the Court inspect the materials in camera to determine whether, as it pertains to each statement or document, the elements of a privilege are met.

    The duration of this motion assumes, for argument's sake, that the entirety of the Black materials are privileged and then argues that the Athens BOE has validly waived the privilege.

    [7]The following discusses cases that deal with the attorney-client privilege of a corporation.  The Athens BOE is a public entity—not a corporation.  Nevertheless, as discussed below, the Court should apply the corporation-privilege cases here.

    There is divergent authority as to whether a public entity may assert attorney-client privilege in the context of a criminal case.  Compare In re Witness Before Special Grand Jury 2000-2, 288 F.3d 289, 293–94 (7th Cir. 2002) (in the context of a grand jury investigation, declining to recognize privilege to communications between a state's secretary of state and an attorney for the secretary of state's office in part because "[a] state agency . . . cannot be held criminally liable by either the state itself or the federal government" and therefore, there is "no need to offer attorney-client privilege as an incentive to increase compliance with the laws"), with In re Grand Jury Investigation, 399 F.3d 527, 534–35 (2d Cir. 2005) (holding that a state governor's office could assert attorney-client privilege to prevent a governor's office attorney from testifying before a grand jury because, among other reasons, "[i]t is crucial that government officials, who are expected to uphold and execute law and who may face criminal prosecution for failing to do so, be encouraged to seek out and receive fully informed legal advice").

    Although no court appears to have discussed whether a local board of education is entitled to attorney-client privilege when it communicates with a board attorney, several courts have treated those communications as privileged.  See Smith v. Bd. of Educ. Of City of Chi., No. 17 C 7034, 2019 WL 2525890, *2 (N.D. Ill. June 19, 2019); Case v. Unified Sch. Dist. #233, Johnson Cnty., Kan., No. 94-2100-GTV, 1995 WL 358198, *4–8 (D. Kan. June 2, 1995).

"[F]or solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348, 105 S. Ct. 1986, 1991 (1985).  A waiver of attorney-client privilege may be express or implied.  A client makes an implied waiver when the client takes actions that are inconsistent with the preservation of the privilege.  See In re Columbia/HCA Healthcare Corp. Billing Practices Litigation, 293 F.3d 289, 294–95 (6th Cir. 2002); see also United States v. Sanmina Corp., 968 F.3d 1107, 1124 (9th Cir. 2020) ("Thus, the focal point of our inquiry is whether, under the totality of the circumstances, Sanmina acted in such a way that is inconsistent with the maintenance of secrecy against its adversary in regard to the Attorney Memos.").

## B.    The Bevill Test

In In re Grand Jury Investigation No. 83-30557, a judge of the United States District Court for the Northern District of Georgia noted that "if the corporation waives the privilege, the question arises as to whether the individual agents, officers, or employees of the corporation may be permitted to assert the privilege to prevent the disclosure of information conveyed by them to the corporation's in-house or retained attorney."  In re Grand Jury Investigation No. 83-30557, 575 F. Supp. 777, 778–79 (N.D. Ga. 1983).

After surveying relevant cases on the issue, the court held that "in order to assert the attorney-client privilege," former employees of a corporation that elected to waive privilege "with respect to . . . matters which [a] grand jury [was] investigating," id. at 778, the former

---

The Eleventh Circuit does not appear to have addressed whether and to what extent a school board, or any public entity, may assert, in the context of a criminal investigation or prosecution, attorney-client privilege.  The Court need not do so here.  Instead, the Court should assume, without deciding, that a privilege exists, and then hold that the privilege may be waived by the Athens BOE.  In assessing the extent of the privilege, the corporation-privilege cases should be controlling.  See In re Grand Jury Investigation, 399 F.3d at 535 (applying Upjohn to determine the scope of the privilege).

employees had to "satisfy five requirements," id. at 780.  Namely, the former employees had to

show: (1) "they approached [the corporate attorney] for the purpose of seeking legal advice";

(2) "when they approached [the corporate attorney] they made it clear that they were seeking

legal advice in their individual, rather than representative, capacities"; (3) "[the corporate

attorney] saw fit to communicate with them in their individual capacities, knowing that a

possible conflict could arise"; (4) "their conversations with [the corporate attorney] were

confidential"; and (5) "the substance of their conversations with [the corporate attorney] did not

concern matters related either to their official duties within the company or the general affairs of

the company." Id. at 780.

Thereafter, in Matter of Bevill, Bresler & Schulman Asset Management Corporation, 805

F.2d 120 (3d Cir. 1986), the Third Circuit affirmed a lower court's use of the test first articulated

by the Georgia district court.  Id. at 123, 125 ("A corporate official . . . may not prevent a

corporation from waiving its privilege arising from discussions with corporate counsel about

corporate matters.").  Following that case, the five-part test came to be known as "the Bevill test"

and the First, Second, Ninth, and Tenth Circuits adopted it.  See United States v. Graf, 610 F.3d

1148, 1159–60 (9th Cir. 2010); In re Grand Jury Subpoena, 274 F.3d 563, 571 (1st Cir. 2001); In

re Grand Jury Subpoenas, 144 F.3d 653, 659 (10th Cir. 1998); United States v. Int'l Brotherhood

of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 119 F.3d 210, 215 (2d Cir. 1997).

Additionally, the Sixth Circuit cited Bevill with approval and indicated that it requires, at

minimum, that the second prong be met for an employee to invoke privilege over a corporate

waiver.  See Ross v. City of Memphis, 423 F.3d 596, 605 (6th Cir. 2005).

While the Eleventh Circuit has not yet addressed the issue of when an individual

employee may invoke privilege after a corporation has waived its privilege, district courts within

11

the circuit have applied the Bevill test.  In re Grand Jury Subpoena 2009R00030 Served on Jan. 19, 2012, No. 1:13-cr-12(WLS), 2013 WL 3990655, *2–3 (M.D. Ga. June 2, 2013); United States v. Maxwell, No. 05-20571-CR-SEITZ/MCALILEY, 2006 WL 8439795, *7 (S.D. Fla. Oct. 4, 2006).

In the absence of guidance from the Eleventh Circuit, this Court should do likewise and apply the Bevill test here.  As a district court observed, the test "is sound because it divides the officer's corporate and individual selves and ensures that the officer's personal interests do not hamstring the corporation's control of its privileges."  In re Grand Jury Subpoena, 2013 WL 3990655, at *3.

Moreover, application of the Bevill test makes sense in the context of communications between governmental entity attorneys and employees.  Often, in the context of governmental entities, changes in leadership are accompanied by changes in policy, goals, and personnel.  To permit a former leader of a governmental entity to, after he or she leaves office, control the office's privilege could have the effect of preventing the new leadership from implementing its policy goals.  And, given the frequency with which control of public entities shifts from one group to another, employees and leaders of public entities must recognize the non-absolute nature of the confidentiality of their communications with the entities' attorneys.  As the Second Circuit observed when it recognized that privilege covered communications between a governor and a governor's office attorney, "in the government context, the individual consulting with his official attorney may not control the waiver of the privilege" and "[e]ven if he does control the waiver during his time in government, the possibility remains that a subsequent administration might purport to waive the privilege exercised by a predecessor."  In re Grand Jury Investigation, 399 F.3d at 534–35.

12

C.      **The Athens BOE's Waiver of Privilege**

Before turning to the legal analysis, it is important to review the relationship that existed among Trey Holladay, Black, and the Athens BOE.  The Athens BOE is the entity tasked with overseeing and administering ACS.  See Ala. Code § 16-11-9 ("The city board of education is hereby vested with all the powers necessary or proper for the administration and management of the free public schools within such city and adjacent territory to the city which has been annexed as a part of the school district which includes a city having a city board of education.").  Trey Holladay, the former superintendent of ACS, was an employee of the Athens BOE.  See Ala Code § 16-12-1(a) ("The city board of education shall appoint a city superintendent of schools to hold office at the pleasure of the board.   The city superintendent of schools shall receive such compensation as the city board of education shall direct.   The city board of education may remove the city superintendent of schools for incompetency, immorality, misconduct in office, willful neglect of duty, or when, in the opinion of the board, the best interests of the schools require such action."); Ala. Code § 16-12-3(d) ("The city board of education shall appoint as its executive officer a superintendent of schools, who may also be secretary of the board of education.").  ACS retained Black for the purpose of providing legal advice to the Athens BOE and ACS employees.  See Athens Bd. of Educ. Policy BBE (May 18, 2016), available at https://www.acs-k12.org/site/handlers/filedownload.ashx?moduleinstanceid=5606&dataid=2551&FileName=BBE-School_Board_Attorney.pdf (last visited Sept. 20, 2021).

In light of these facts, the Athens BOE is the holder of the privilege.  See Weintraub, 471 U.S. at 348, 105 S. Ct. at 1991.  And, the board, for the limited purpose of this case, has waived the privilege.  The board's filing of the joint motion and stating its intent to permit Black to

cooperate with the subpoena could be viewed as an express waiver of its attorney-client privilege.  Alternatively, the Court could find that the Athens BOE's actions were inconsistent with the maintenance of secrecy and thus constituted an implied waiver of the privilege.  See Sanmina Corp., 968 F.3d 1107, 1124.  Either way, pursuant to the protective order, see Doc. 160, for the limited purpose of this case, the privilege is waived.  As such, the government may receive and review the documents responsive to the subpoena and its agents may speak with Black about privileged communications.

This is true, notwithstanding Trey Holladay's assertion of privilege.  To determine whether Trey Holladay maintains any privilege after the Athens BOE's waiver, the Court should apply the Bevill test.  Applying those factors, so far as the government knows, Trey Holladay cannot meet his burden of showing that communications between him and Black are privileged, notwithstanding a waiver by the Athens BOE.  805 F.2d at 123.

Specifically, the second, third, and fifth factors are lacking.  See id.  The government has no information suggesting that Trey Holladay ever approached Black seeking legal advice in his personal capacity—as opposed to his capacity as the superintendent of ACS.  Moreover, the government does not have any information suggesting that Black saw fit to deal with Trey Holladay as an individual, notwithstanding the potential conflict of interests that might ensue from his doing so.

Finally, even if Trey Holladay could present evidence sufficient to satisfy the second and third factors, it seems improbable that he could satisfy the fifth prong.  See id.  The subpoena seeks only documents that pertain to the virtual education fraud scheme Trey Holladay implemented in his capacity as the superintendent.  Likewise, at trial, the government will only question Black about such matters.  Those matters all pertain to "matters related either to [Trey

14

Holladay's] official duties within the [school district] or the general affairs of the [school district]."  See id.

## IV. THE CRIME-FRAUD EXCEPTION

Although the government believes that the Court should resolve the issue on the waiver argument, even if Trey Holladay could satisfy the requirements of the Bevill test, the Black materials would still not be subject to attorney-client privilege.  This is because the crime-fraud exception would apply and render them non-privileged.[8]

**A.    Crime-Fraud Exception Principles**

"[T]he attorney-client privilege does not protect communications made in furtherance of a crime or fraud."  In re Grand Jury Subpoena, 2 F.4th 1339, 1345 (11th Cir. 2021) (quotation marks omitted).  To determine "whether the crime-fraud exception applies to an otherwise privileged communication," the Eleventh Circuit applies a two-part test.  Id.

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice.  Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

Id.

On the first prong, "the government's burden is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed."  Id. (quotation marks omitted).  To meet this burden, the government must provide, at minimum, "a good faith statement as to what evidence is before the grand jury." Id. (quotation marks and alterations omitted).

---

[8]The government asks that, if the Court finds the waiver argument compelling, that the Court resolve the matter on the basis of that argument and avoid the crime-fraud exception issue.

As for the second prong, the Eleventh Circuit has not "delineate[d] the precise contours of the test." Id.  Historically, the Court has held that "the requirement that legal advice must be related to the client's criminal or fraudulent conduct should not be interpreted restrictively." In re Grand Jury Investigation, 842 F.2d 1223, 1227 (11th Cir. 1987).  Recently, the Court left open the possibility that it might hold that "the second prong of the exception covers only communications which advance, or which the client intends to advance, the client's criminal or fraudulent purpose." Subpoena, 2 F.4th at 1350 (quotation marks and alterations omitted).

If a party seeking application of the exception cannot meet both prongs, the Court may conduct an in camera review to determine whether the exception applies.  Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1417 (11th Cir. 1994).  To obtain in camera review, the government need only "present evidence sufficient to support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability." Zolin, 491 U.S. at 574–75, 109 S. Ct. at 2632.

**B.    Evidentiary Proffer**

Before addressing the application of the prongs, the government makes a proffer of evidence.  First, the government incorporates by reference the allegations contained in the indictment.  Second, the information obtained by the government shows the following:

- On March 2, 2016, Black attended a meeting with Trey Holladay at the office of the state superintendent of education.  By this point, ACS had enrolled and counted in its enrollment reports for fiscal year (FY) 2016 students from Marengo Academy in Linden, Alabama.  The ASDE had learned about this and called a meeting.  At the meeting, according to an ASDE official who attended the meeting, Trey Holladay acknowledged his understanding that the ASDE did not approve of enrolling in public

16

virtual schools students who were otherwise full-time private school students, and Trey Holladay agreed to discontinue the practice.  See Doc. 1 at 15, ¶ 58.

- On March 7, 2016, Black sent an electronic mail message to the ASDE official.  In that message, Black, acting on behalf of ACS, acknowledged ACS's commitment to "pull back" and, going forward, require proof from all incoming virtual students that the students had un-enrolled in a previous private school.  See id. at 16, ¶ 59; Att. 4 (Mar. 7, 2016 Email from Black to Craig).

- As described in detail in the indictment, following March 7, 2016, ACS did not in fact stop associating with private schools and enrolling private school students.  Instead, ACS expanded the program in the 2016-2017 school year to include 5 schools and almost 1,000 students.

- On August 17, 2017, the state superintendent of education (a new superintendent since the March 2016 meeting) sent Trey Holladay a letter informing him that the ASDE had learned about the enrollment of private school students and was, as a result, reviewing ACS's enrollment figures.  See Att. 5 (Aug. 17, 2017 Memo from Sentance to Trey Holladay).  This letter triggered a series of exchanges between ACS and ASDE officials.

- That day, Trey Holladay responded with an electronic mail message to the superintendent, copying Black.  In that message, Trey Holladay wrote, "It is extremely frustrating to have started school and be hit with something that happened the previous school year.  We have done everything the law requires, the ALSDE has asked and directed, and our board policy governs.  We passed our virtual school audit this past spring and invited the department back to review records when questions

were asked in early summer.  We have now been taken to task three years in a row.

We are more than willing to correct or explain any identifiable problems, but totally

object to doing everything asked and then being penalized."  <u>See</u> Att. 6 (Aug. 17,

2017 Email from Trey Holladay to Sentance) at 2–3.

- On Monday, September 18, 2017, Black sent an electronic mail message to the

  general counsel for the ASDE.  In it, he wrote,

  > Juliana,
  >
  > Good afternoon!
  >
  > Please see the attached information sheet concerning the
  > items we discussed on Friday.  Please call me with any
  > questions.

See Att. 7 (Sept. 18, 2017 Email from Black to Dean and Attachment) at 1.  Attached

to the message appeared to be a "timeline" of ACS's virtual education program

development.  <u>Id.</u> at 2–4.  Although Black sent the document to the general counsel

on this date, it is unclear that he prepared it.  In any event, the timeline stated, among

other things: (1) that there were students included in ACS's enrollment report for FY

2017 who attended Lakeside School and Marengo Academy (the two private schools

that the ASDE had already identified as providing student information to ACS), <u>id.</u> at

3–4; (2) that the private schools allowed students to work on ACS classes each day

and that all students were taking at least 5 classes through ACS's virtual school, <u>id.</u>;

(3) that ACS had no direct relationship with either school, <u>id.</u>; and (4) that ACS paid a

vendor (presumably Ed Op) to ensure that the students had effective internet

connections, <u>id.</u>  The timeline then argued that nothing about ACS's inclusion of

these private school students violated any law, as there was nothing in state law that

precluded public school students from engaging in outside activities, "(whether enrolled at a private academy, Sunday school, or private swimming lessons)." Id. at 4.

- According to an ASDE official, at some point during this period, Trey Holladay met with the general counsel for the ASDE and other ASDE officials.  The ASDE official stated that an attorney for either Trey Holladay or ACS also attended the meeting.  At this time, as far as the government is aware, Black was the attorney for the Athens BOE.  During the meeting, Trey Holladay stated that the private school students from Marengo Academy and Lakeside School were the only private school students included in ACS's enrollment figures.  Trey Holladay defended the enrollment of these students, arguing that there was no definition of "full-time virtual student" to be found in state law or regulations.

- On April 30, 2018, Trey Holladay sent a memo to Richardson, the interim state superintendent.  See Att. 8 (Apr. 30, 2018 Memo from Trey Holladay to Richardson). It is not clear that Shane Black drafted this memo.  However, the memo contained legal arguments and appeared as though it was drafted by an attorney.  See id. at 5–6. As far as the government is aware, Black was the Athens BOE's attorney.  In the memo, Trey Holladay made false claims.  For example, Trey Holladay wrote, that during the 2016-2017 school year, ACS

> did not try to police or monitor students' activities with respect to any relationship or non-relationship with a non-public school.  However, ACS also began to take steps to wind down any enrollments that were also associated with nonpublic schools, for example, by amending one of its local policies during the 2016-17 school year to remove the reference to nonpublic schools.

Id. at 3.  Trey Holladay closed the letter, writing,

> if ALSDE withholds the $2 million in Foundation Program
> funding for the 2016-17 enrollments, then it will be doing so
> retroactively or ex post facto—applying today's new
> interpretation to counteract yesterday's interpretation.
> However, we have already expended funds to provide full-
> time education services to these 2016-17 students—and we
> cannot retroactively reverse those expenses or those
> services.

Id. at 6.

- On May 17, 2018, Carter electronically transmitted to Corkren a "revised termination
  agreement" between ACS and Corkren's company, Educational Opportunities and
  Management, LLC (Ed Op).  See Att. 9 (May 17, 2018 Email from Carter to
  Corkren).  In the revised agreement, ACS agreed to pay Ed Op: (1) $81,300 upon
  execution of the agreement by Corkren; and (2) $220,800 upon Ed Op's performance
  of all obligations.  See Att. 10 (Revised Termination Agreement).  Notably, a
  significant portion of this money was to be paid so that Corkren could fulfill his
  obligations to pay private schools and private school employees (and to give cash to
  Trey Holladay, as, according to Corkren, around this time, he gave Trey Holladay
  $20,000 in cash).  When Carter sent the message to Corkren, he was forwarding an
  electronic mail message sent to him by Trey Holladay attached to which was the draft
  agreement.  See Att. 9.  And, when Trey Holladay sent the electronic mail message to
  Carter, he was forwarding a message sent to him by Black containing the draft
  agreement.  See id.  Therefore, the email sequence at least suggests that the
  agreement originated with Black.

- Contrary to the communications described above, during this period, ACS had included in its enrollment information students who were, in reality, full-time private school students who were not being educated by ACS.  See Doc. 1 at 29, ¶ 113

## C.    The First Prong

The allegations in the indictment, along with the above-described information, establish a prima facie showing that, during the time at issue, Trey Holladay and others participated in a conspiracy to commit mail and wire fraud.  See 18 U.S.C. §§ 371, 1341, 1343.  Additionally, the government's evidence indicates that Trey Holladay committed substantive acts of wire fraud, see 18 U.S.C. § 1343, as well as aggravated identity theft, see 18 U.S.C. § 1028A.

In short, the government's allegations show that: (1) Trey Holladay and others were falsely including in ACS's enrollment figures students who were in reality full-time private school students who were not being educated by ACS; (2) based on the false inclusion of these students, the ASDE was paying more money to the district than it otherwise would; (3) Trey Holladay and others were diverting some of this funding for their own personal use; (4) the defendants were using wire communications in interstate commerce and the United States mail to carry out the scheme; and (5) in furtherance of the scheme, the defendants used, without authorization, identifying information of real individuals.

Importantly, the allegations show that Trey Holladay participated in this scheme during the same period that he sought Black's counsel.  These allegations are, therefore, sufficient to meet the "low hurdle" that exists on the first prong.  See Subpoena, 2 F.4th at 1345.

## D.    The Second Prong

On the second prong, the above-recounted facts make clear that, at minimum, Trey Holladay's receipt of legal advice from Black was closely related to the fraudulent activity.

21

Alternatively, even under a more stringent standard, the government is able to meet its burden on this prong.[9]

In assessing the second prong, the facts of the Eleventh Circuit's recent decision in <u>In re Grand Jury Subpoena</u> are helpful.  In that case, the government was investigating whether a candidate for public office committed wire fraud when the candidate: (1) solicited money from donors "for the specific purpose of furthering the candidate's chances of being elected"; and (2) then used some of the money raised to pay personal expenses.  <u>Id.</u> at 1342.  During its investigation, the government learned, through a voluntary interview with the attorney for the campaign, that the attorney: (1) "provided legal advice to the Campaign, including by advising the candidate on completing and filing the financial disclosure forms"; (2) "reviewed the account statements for the Campaign's bank accounts"; (3) "created draft campaign disclosure forms"; (4) "reviewed and revised draft campaign disclosure forms created by other Campaign staff members, and provided those draft forms for review and finalization by the candidate"; (5) "file[d] the forms with the relevant state and local governmental entities" and (6) "during his review of the bank accounts, . . . observed several expenditures that appeared to be personal in nature."  <u>Id.</u>  After learning this information, the government served on the attorney a grand jury subpoena for testimony.  <u>Id.</u> at 1343–42.  The attorney then advised the government of his intent to invoke attorney-client privilege and the government moved to compel the testimony.  <u>Id.</u> at 1343.  In turn, the attorney moved to quash the subpoena.  <u>Id.</u>  Following a hearing, the district court denied the motion to quash and ordered the attorney to testify regarding certain matters

---

[9]The government does not suggest that Black was complicit in the scheme or that he had personal knowledge of the fraudulent conduct.  If the crime-fraud exception applies, the government argues only that <u>Trey Holladay solicited</u> legal advice and assistance in furtherance of the fraudulent conduct.  The government does not contend that <u>Black gave</u> legal advice and assistance in furtherance of the scheme.

that, the district court found, were excluded from attorney-client privilege by the crime-fraud exception.  Id. at 1344.  The attorney appealed and the Eleventh Circuit affirmed.  Id.

In doing so, the Court held, in part, that the government's motion to compel contained facts sufficient to meet its burden on the second prong—regardless of whether that prong is applied in a more or less exacting manner.  Id. at 1350.  In doing so, the Court stressed that the attorney, by his own admission, revised the financial disclosure forms "after becoming aware of the personal expenditures and before the forms were officially filed."  Id. at 1351.  The Court reiterated,

> After making the personal expenditures at issue, but before filing his financial disclosure forms, the candidate sought or obtained legal advice from the attorney regarding his obligations under Georgia law.  We find it significant that, at this time, the personal expenditures had already been made—and that the subsequently filed disclosure forms either distorted the nature of the expenditures or failed to list them altogether.  Any legal assistance the candidate received in regards to the expenditures he did not intend to report is related to his fraud.  Likewise any assistance the candidate received in filing the disclosure forms in which he did not report those expenditures is related to his fraud.

Id. (quotation marks and alterations omitted).  Based on these facts, the Court found "a sufficient nexus between the alleged 'criminal or fraudulent activity' and the communications at issue to pierce the attorney-client privilege."  Id.

There are strong similarities between that case and the facts here.  Just as the attorney in that case was aware of the personal expenditures, here, Black was undoubtedly aware, by no later than March of 2016, that ACS had at least attempted to enroll private school students.  See id.  Additionally, the above-recounted facts strongly suggest that after October 12, 2016 (the first date, according to the indictment, that the defendants caused data containing private school students to be transmitted from ACS to the ASDE for funding calculation purposes, see Doc. 1 at

29, ¶ 113), but <u>before</u> the ASDE made its final decision on whether or not to withhold funding from ACS, Trey Holladay sought the advice and assistance of Black.

Although the government is not, at this time, aware of specific conversations that occurred between Black and Trey Holladay during the relevant period, one can draw an inference that such conversations occurred and that, during those conversations, Black gave Trey Holladay legal advice regarding how ACS could avoid the recoupment of funds.  This inference arises from the following facts: (1) Black's contacting the ASDE attorney and providing information regarding ACS's enrollment of private school students; (2) Black's accompanying Trey Holladay to at least one meeting at the ASDE office; and (3) Black's receiving copies of communications between ACS officials and ASDE officials relevant to the matter.  Given all of this, it strains credulity to think that Trey Holladay and Black did not discuss how, within the framework of Alabama school funding statutes and regulations, ACS could obtain full funding for the private school students.  Moreover, the Eleventh Circuit has long recognized that the government can satisfy its burden on the second prong even though it lacks knowledge of the precise nature of the communications.  <u>See</u> <u>In re Grand Jury Investigation</u>, 842 F.2d at 1227 ("Furthermore, the determination whether the requested material is sufficiently related to the investigation must take into account that the government does not know precisely what the material will reveal or how useful it will be.").

Alternatively, the fact that the May 17, 2018 agreement originated with Black and that the agreement was in furtherance of the scheme to pay money to Trey Holladay, indicates Trey Holladay requested that Black draft the agreement to "advance[] . . . the client's criminal or fraudulent conduct."  <u>Subpoena</u>, 2 F.4th at 1351 (quotation marks and alterations omitted).[10]

---

[10]The government recognizes that the crime-fraud exception would not cover all conversations between Black and Trey Holladay during the relevant period.  Certainly, the two had many conversations which, if the Court

24

**E.**     **Request for <u>In Camera</u> Review**

Alternatively, the government's information establishes a reasonable belief that the government can meet the elements of the crime-fraud exception.  Accordingly, if the Court does not find the elements of the crime-fraud exception met, then the government asks the Court to conduct an <u>in camera</u> review of the documents and the information that Black would provide. <u>See</u> <u>Cox</u>, 17 F.3d at 1417.

## V. REQUEST FOR EXPEDITED RULING

This case is complex.  The government anticipates that it will call well over 100 witnesses and that the trial will take several weeks.  Should Black testify, he will, in all likelihood, be a very significant witness.  As such, the trial strategy of each party will vary depending on whether the government is able to offer the Black materials.  Given the complexity of the case, the amount of preparation required, and the importance of the Black materials, all parties will benefit from knowing as far in advance as possible whether the government will obtain and seek to admit the Black materials.  Accordingly, the government asks that the Court rule on this motion as quickly as possible.

## VI. CONCLUSION

Based on the foregoing, the government asks that the Court enter an order provisionally admitting the Black materials.  The government further requests that the Court consider this motion as soon as possible.

---

does not uphold the school board's waiver, might remain privileged.  The government asks that the Court hold that only testimony related to the types of records requested in the subpoena attachment is covered by the crime-fraud exception.

25

Respectfully submitted this 21st day of September 2021.

VERNE H. SPEIRS
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515

/s/Jonathan S. Ross
Jonathan S. Ross
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: jonathan.ross@usdoj.gov

/s/Alice S. LaCour
Alice S. LaCour
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: alice.lacour@usdoj.gov

/s/Brett J. Talley
Brett J. Talley
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: brett.talley@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.  2:21-CR-49-MHT-JTA-1 |
| | ) | |
| WILLIAM LEE HOLLADAY, III | ) | |

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record.

Respectfully submitted,

/s/Jonathan S. Ross
Jonathan S. Ross
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: jonathan.ross@usdoj.gov