IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.  2:21-CR-49-MHT-JTA-1 |
| | ) | |
| WILLIAM LEE HOLLADAY, III | ) | |

## PLEA AGREEMENT

## I. BACKGROUND INFORMATION

### A.  Attorneys

Defense Attorney:

Joseph C. Espy, III,
Benjamin J. Espy, and
William M. Espy

Assistant United States Attorneys:

Jonathan S. Ross,
Alice S. LaCour, and
Brett J. Talley

### B.  Counts and Statutes Charged

Count 1:                                18 U.S.C. § 371 – Conspiracy

Counts 2–85, 88–89, 91:        18 U.S.C. § 1343 – Wire Fraud

Counts 93–127:                      18 U.S.C. § 1028A(a)(1) – Aggravated identity theft

### C.  Count Pleading Pursuant to Plea Agreement

Count 1:       18 U.S.C. § 371

### D.  Statutory Penalties

Count 1:       18 U.S.C. § 371

A term of imprisonment of not more than 5 years, a fine of not more than $250,000, or twice the value of the property involved in the transaction, whichever is greater, or both the fine and imprisonment; a term of supervised release of not more than 3 years; an assessment fee of $100; and an order of restitution.

**E.    Elements of the Offense**

Count 1:           18 U.S.C. § 371:
    First:        Two or more people in some way agreed to try to accomplish a shared and unlawful plan;
    Second:       The defendant knew the unlawful purpose of the plan and willfully joined in it;
    Third:        During the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment;
    Fourth:       The overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

Object Offense:    18 U.S.C. § 1343:
    First:        The defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;
    Second:       The false pretenses, representations, or promises were about a material fact;
    Third:        The defendant acted with the intent to defraud; and
    Fourth:       The defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

Object Offense:    18 U.S.C. § 1341:
    First:        The defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;
    Second:       The false pretenses, representations, or promises were about a material fact;
    Third:        The defendant acted with the intent to defraud; and
    Fourth:       The defendant used the United States Postal Service by mailing or causing to be mailed some matter, communication, or item to carry out the scheme to defraud.

## II. INTRODUCTION

    Jonathan S. Ross, Alice S. LaCour, and Brett J. Talley, Assistant United States Attorneys, and Joseph C. Espy, III, Benjamin J. Espy, and William M. Espy attorneys for the defendant, William L. Holladay, III, pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, with the authorization of the defendant, submit this plea agreement.  The terms are as follows.

### III. THE GOVERNMENT'S PROVISIONS

1.      Pursuant to Rule 11(c)(1)(A), the government agrees that it will, at the sentencing hearing, move to dismiss Counts 2 through 85, 88, 89, 91, and 93 through 127.  The government further agrees that it will not bring any additional charges against the defendant for the conduct described in the Indictment.

2.      The government acknowledges that the defendant assisted authorities in the investigation and prosecution of the defendant's own misconduct by timely notifying the government of the defendant's intention to enter a guilty plea, thereby permitting the government to avoid preparing for trial and allowing the government and the Court to allocate resources efficiently.  Provided the defendant otherwise qualifies, and that the defendant does not, before the date of the sentencing hearing, either personally or through the actions of the defense attorney on behalf of the defendant, take any action inconsistent with the acceptance of responsibility, the government will move at or before the sentencing hearing for a further reduction of one level.  See U.S.S.G. § 3E1.1(b).  Determination of whether the defendant met the defendant's obligations to qualify for a reduction pursuant to § 3E1.1(b) is at the sole discretion of the government.  Further, the government reserves the right to oppose the defendant's receiving a two-level reduction pursuant to § 3E1.1(a) should the government receive information indicating that, between the date of the plea hearing and the date of the sentencing hearing, the defendant, either personally or through the actions of the defense attorney on behalf of the defendant, has acted inconsistently with the acceptance of responsibility.

3.      The government reserves the right to argue for or against the application of any specific offense characteristic or Chapter 3 adjustment.  Additionally, the government reserves the

right to provide information to the United States Probation Office (Probation) regarding the defendant's criminal history. This agreement does not obligate the government to make any recommendation regarding the defendant's criminal history score or resulting criminal history category.

4. In consideration for the defendant's plea of guilty to Count 1, the government will, within 24 hours of the defendant entering and the Court accepting his guilty plea, seek leave of the Court pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure to dismiss with prejudice all charges pending in the indictment against the defendant's spouse, Co-defendant Deborah Irby Holladay. The government further agrees that, provided that the defendant enters his guilty plea, the government will not pursue any additional charges against Deborah Irby Holladay arising out of conduct alleged in the Indictment.

5. The government agrees that it will not, in any civil, criminal, or administrative forfeiture proceeding related to the matters alleged in the Indictment in this case, seek to obtain any funds currently held in any pension account owned by TREY HOLLADAY or his spouse. The defendant agrees that he will, within 48 hours of entering his guilty plea, voluntarily surrender all professional education certifications and licenses he currently holds.

## IV. THE DEFENDANT'S PROVISIONS

### A.      Plea and Sentencing

6. The defendant agrees to plead guilty to Count 1 and to make factual admissions of guilt in open court. The defendant further agrees to waive any right the defendant may have to subsequently withdraw the guilty plea pursuant to Rule 11(d)(2). The defendant also promises to

refrain from taking any action inconsistent with the defendant's acceptance of responsibility for the offense to which the defendant is pleading guilty.

7.     The defendant acknowledges his understanding that he will be allowed an opportunity to withdraw his guilty plea in the event that the Court does not accept any or all of the provisions set forth pursuant to Rule 11(c)(1)(A).

8.     The defendant agrees that, at or before the sentencing hearing, he will not request any sentence that includes a term of imprisonment of less than 30 months' imprisonment.

9.     The defendant agrees not to commit any other federal, state, or local offense while awaiting sentencing, regardless of whether that offense is charged or chargeable.  The defendant agrees to provide truthful information to Probation and to the Court in all presentence and sentencing proceedings.

**B.     Fines and Restitution**

10.     The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of the Court.  The defendant acknowledges that the full fine and restitution amounts shall be considered due and payable immediately.  If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of Probation at any time, the defendant agrees that the United States Bureau of Prisons and Probation will have the authority to establish payment schedules to ensure payment of the fine and restitution.  The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off from federal payments, execution on non-exempt property, and any other means the government deems appropriate.  The defendant also agrees that the defendant may be contacted by government

officials regarding the collection of any financial obligation imposed by the Court without notifying the defendant's attorney and outside the presence of the defendant's attorney.

11.     To facilitate the collection of financial obligations imposed in this case, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or third party.  Further, the defendant will, if requested by the government, promptly submit a completed financial statement to the Office of the United States Attorney for the Middle District of Alabama in a form the government provides and as the government directs.  The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful. The defendant expressly authorizes the government to obtain a report on the defendant's credit in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

12.     The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this agreement or that may be imposed upon the defendant by the Court.  In addition, the defendant promises that the defendant will make no such transfers in the future.

13.     The defendant agrees to pay the $100 assessment fee on the date of sentencing.

## C.     Freedom of Information Act Waiver

14.     The defendant agrees to waive and hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, but not limited to, any records that may be sought under the Freedom of Information Act, see 5 U.S.C. § 552, or the Privacy Act of 1974, see 5 U.S.C. § 552a.

**D.     Forfeiture of Assets**

15.     The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession of the government, the defendant, or defendant's nominees.

16.     The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal or civil judicial or administrative forfeiture action. As such, the defendant hereby withdraws any claim the defendant may have filed in any administrative forfeiture action and agrees to the declaration of forfeiture. The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at the sentencing hearing, or incorporated into the judgment.

17.     The defendant admits and agrees that the conduct described in the factual basis section below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

18.     The defendant agrees to take all steps necessary to assist the government in obtaining clear title to forfeitable assets before the defendant's sentencing.  In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years.  The defendant agrees to be interviewed by the government, prior to sentencing, regarding such assets and their connection to criminal conduct.  The defendant agrees that Rule 11 of the Federal Rules of Criminal Procedure and § 1B1.8 of the Sentencing Guidelines will not protect from forfeiture assets disclosed by the defendant as part of any cooperation provided by the defendant.

19.     The defendant agrees that the government is not limited to forfeiture of the property specifically identified for forfeiture in this plea agreement.  If the government determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the government shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above.  The defendant expressly consents to the forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

20.     Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

21.     The defendant agrees that, in the event the Court determines that the defendant has breached this section of the plea agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, if applicable, and may be eligible for an obstruction of justice enhancement.

22.     The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.   The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon the defendant's heirs, successors, and assigns until the agreed forfeiture, including satisfaction of any preliminary order of forfeiture for proceeds.

**V. FACTUAL BASIS**

23.     The defendant admits the allegations charged in the Indictment and understands that the nature of the charges to which the plea is offered involves proof as to Count 1.  Specifically, the defendant admits the following to be true and correct:

>    a.    At all times relevant, the defendant, WILLIAM LEE HOLLADAY, III (hereinafter, "TREY HOLLADAY"), was a resident of Limestone County, Alabama.  From July of 2013 until October 31, 2020, he was the superintendent of the Athens, Alabama City School District (ACS).

b. TREY HOLLADAY acknowledges and agrees that, should this case go to trial, the government would be able to prove the background information contained in pages 1 through 16 and paragraphs 2 through 48 of the Indictment.

c. While serving as superintendent, TREY HOLLADAY caused ACS to develop the "Athens Renaissance School," a public blended and virtual education school that offered alternative curriculum for Kindergarten through 12th grade (K-12) students. The Athens Renaissance School (Athens Renaissance) was, prior to the 2015-2016 school year, a program that consisted of students who were enrolled in traditional ACS schools. Starting in the 2015-2016 school year, Athens Renaissance was a stand-alone school into which students were directly enrolled by ACS.

d. On June 16, 2015, TREY HOLLADAY, on behalf of ACS, sent an application to the Alabama State Department of Education (ASDE) for a "flexibility contract." A flexibility contract is entered into between the ASDE and a school system and allows the school system to obtain programmatic or budgetary flexibility regarding specified statutes or regulations in order to meet some innovative plan. The request submitted by TREY HOLLADAY sought flexibility regarding various state statutes and regulations in order to implement Athens Renaissance as a virtual education option. In support of the request, ACS submitted Policy ILB and the Addendum to Policy ILB. These were ACS policies that, among other things, described what it meant for a student to be a full-time virtual student of Athens Renaissance. Specifically, the Addendum to Policy ILB, in pertinent part, defined what constituted a "full-time" student of Athens Renaissance: "Full-time students

10

are required to take, at minimum, six (6) credits per year at either the traditional or accelerated pace."

e.  On November 5, 2015, the state superintendent of education informed ACS, through a letter to TREY HOLLADAY, that the ASDE had approved the flexibility contract.  The letter contained a list of "advisements and reminders."  The attached list stated: "Concerning [ACS's] request to allow [ACS] to offer one or more traditional, online, or blended courses to students enrolled in other public or non-public schools (or students that are home schooled) as 'guest students' (or transient students) for a fee, without enrolling them as students in the [ACS] (and thus, not receiving accompanying public funding for such students): No Foundation Program units are earned."

f.  While the flexibility contract was pending, in September of 2015, TREY HOLLADAY came into contact with the administration of Marengo Academy. During discussions, TREY HOLLADAY suggested that Marengo Academy allow ACS to enroll Marengo Academy students in Athens Renaissance.  TREY HOLLADAY offered Marengo Academy: (1) laptop computers; and (2) access to online courses through various learning management systems.  In exchange, Marengo Academy would be required to provide ACS student identifying information, transcripts, and grades.  At TREY HOLLADAY's direction, ACS officials would then use that information to enroll Marengo Academy students in Athens Renaissance and thus make it appear that the Marengo Academy students were full-time ACS non-resident virtual students.

11

g.  Marengo Academy accepted the offer from TREY HOLLADAY.  Accordingly, in the fall of 2015, Marengo Academy officials provided student information to ACS officials.  ACS officials then, acting at TREY HOLLADAY's direction, used that information to enroll the Marengo Academy students into ACS's student information management database.  By doing so, the ACS officials made it appear that the Marengo Academy students were full-time non-resident virtual students of ACS.

h.  In fact, during the 2015–2016 school year, as TREY HOLLADAY knew, the Marengo Academy students were, at all times, full-time students of Marengo Academy.  In most instances, tuition was paid to Marengo Academy for the students to attend.  On normal school days, the students reported to the brick-and-mortar campus of Marengo Academy in Linden.  The students received instruction from teachers employed by Marengo Academy.

i.  In contrast, no tuition was paid to ACS for the Marengo Academy students.  The students did not report to any campus of Athens Renaissance or any other ACS school.  The students were not full-time students of Athens Renaissance or any other ACS school.

j.  Because the Marengo Academy students were listed in ACS's student information management database, the ASDE counted the Marengo Academy students when determining ACS's fall 2015 average daily membership.  This resulted in an increased average daily membership for ACS when compared to its fall 2014

12

average daily membership, and, correspondingly, an increase in funding ACS received from the state, starting in October of 2016.

k. On March 2, 2016, TREY HOLLADAY attended a meeting in Montgomery, Alabama at the ASDE office.  There, he met with the state superintendent of education, the deputy state superintendent of education for the division of administrative and financial services, and others.  An attorney for the ACS board of education also attended the meeting.  During the meeting, the attendees discussed ACS's practice of enrolling private school students in Athens Renaissance and then counting those students in ACS's average daily membership.  The deputy state superintendent of education for the division of administrative and financial services raised concerns about this practice.  In response, TREY HOLLADAY and the ACS board of education attorney agreed to discontinue the practice of associating with private schools.  During the meeting, the state superintendent also advised TREY HOLLADAY that ACS should refrain from enrolling in Athens Renaissance full-time virtual students who did not reside within approximately 100 miles of Athens.

l. Thereafter, TREY HOLLADAY, along with Co-defendants WILLIAM RICHARD CARTER, JR., DAVID WEBB TUTT, and GREGORY EARL CORKREN, among others, formed an agreement whereby they would obtain money and property from the state of Alabama, under false and fraudulent pretenses, and would use the United States Mail and wire communications in interstate commerce to perpetuate the scheme.  Specifically, under the agreement, the defendants: (1) would cause ACS and other public school systems to report to the ASDE enrollment information

13

that included, listed as full-time public virtual students, students who were in fact full-time private school students (attending a private school each day, paying tuition to a private school, receiving instruction from private school teachers, and, in many cases, participating in extracurricular activities at a private school); (2) ACS and other public school systems would receive increased funding from the state (between $5,500 and $7,000 per year for each falsely reported private school student) because of the false reporting of the private school students; (3) ACS and other public school systems would pay portions of that money to a company owned by CORKREN, Educational Opportunities and Management, LLC (Ed Op) and CORKREN would keep a portion of those proceeds for his own personal use; (4) at the direction of TREY HOLLADAY, during the 2017-2018 school year, CORKREN would then cause Ed Op to make payments to a company owned by TUTT, Tutt Educational Services (Tutt Educational), with payments amounting to at least $33,000 per month and TUTT would keep half of those $33,000 payments ($16,500) for his own personal use; and (5) TUTT would then cause Tutt Educational to make monthly payments of $16,500 to Sage Professional Development, LLC, (Sage) a company owned by TREY HOLLADAY's spouse. In furtherance of the scheme, the events described below occurred.

m. In February of 2016, TREY HOLLADAY met with CORKREN. During the meeting and subsequent conversations, TREY HOLLADAY asked CORKREN to: (1) form a limited liability corporation; (2) through the corporation, contract with ACS; (3) pursuant to that contract, contact private schools and offer incentives to

encourage the private schools to permit ACS to enroll the private school students in Athens Renaissance; and (4) through the corporation, receive payments from ACS.

n.  On April 22, 2016, ACS and Ed Op entered into a "SERVICES AGREEMENT." TREY HOLLADAY executed the contract for ACS; CORKREN executed the contract for Ed Op.  The term of the contract was to run from May 1, 2016 through June 30, 2017.  The preamble of the contract stated: "There are anticipated to be a significant number of [Athens Renaissance] full-time and guest enrollment students in the Marengo County, Alabama area . . . during the 2016-17 school year" and "ACS seeks assistance with respect to the logistics and administrative issues presented by serving the Students."  The contract obligated Ed Op to fulfill various responsibilities related to the students it would serve.  For doing so, ACS agreed to pay Ed Op a fee of $45 per month per student serviced.  The fee was to be paid monthly in arrears, with the first payment due on June 1, 2016 and the last payment due on July 1, 2017.

o.  During February, March, and April of 2016, TREY HOLLADAY and CARTER worked to recruit private schools to provide student information that could be used to enroll private school students in Athens Renaissance.  They did so by offering the schools: (1) access to Odysseyware; (2) laptop computers; (3) increased internet capabilities; (4) standardized testing; and (5) monetary payments.  In exchange, TREY HOLLADAY and CARTER asked the school officials to provide ACS (though Ed Op, the intermediary) with: (1) student and parent identifying

15

information: (2) academic transcripts: and (3) at the end of each semester, copies of the students' report cards.

p.  On May 2 and May 3, 2016, ACS hosted a "Digital Learning Showcase." TREY HOLLADAY, CARTER, and CORKREN attended this event. Representatives of Jackson Academy, Pickens Academy, the Lakeside School, and Southern Academy attended the event. ACS, directly or indirectly, paid for lodging and meals for these private school representatives. During the event, TREY HOLLADAY encouraged private school representatives to associate with ACS in exchange for various benefits.

q.  Thereafter, representatives from each of the above-described four private schools accepted the above-described benefits and, in exchange, provided student information to CORKREN. CORKREN then relayed that information to ACS officials. The private school students were then fraudulently enrolled as full-time Athens Renaissance virtual students for the 2016–2017 school year. Additionally, during the summer of 2016, representatives from Marengo Academy, yet again, also agreed to and did provide student information to ACS for the 2016–2017 school year.

r.  TREY HOLLADAY, CARTER, and CORKREN then began to use a code to refer to the private schools providing student information to be used for fraudulent enrollment. They referred to Marengo Academy as "EO1." Jackson Academy was "EO2." Pickens Academy was "EO3." The Lakeside School was "EO4." Southern Academy was "EO5."

s.  During the summer of 2016, CORKREN visited the various campuses of the private schools that had agreed to provide student information to ACS.  On some occasions, he delivered laptop computers to the schools.  These laptop computers were purchased with ACS funds.  Some bore ACS property inventory stickers. Specifically, in August and September of 2016, CORKREN made the following computer deliveries at the direction of TREY HOLLADAY: (1) CORKREN delivered approximately 40 laptop computers to Pickens Academy; (2) CORKREN delivered approximately 50 laptop computers to Jackson Academy; (3) CORKREN delivered approximately 45 laptop computers to Southern Academy; and (4) CORKREN delivered approximately 50 laptop computers to the Lakeside School.  CORKREN did all of this at the direction of CARTER and TREY HOLLADAY.

t.  After a private school agreed to participate, CORKREN required that the private school provide him with a signed copy of an ACS "Virtual/Non-Resident Enrollment Form" for each of the private school's students.  CORKREN did so at the direction of TREY HOLLADAY.  At the direction of TREY HOLLADAY, CORKREN instructed the private school officials that they, the officials, could sign the forms for their students and that parents did not need to sign the enrollment forms.  During the summer of 2016: (1) the headmaster of Jackson Academy signed enrollment forms for Jackson Academy students; (2) the assistant headmaster of Pickens Academy signed enrollment forms for Pickens Academy students; and (3) the headmaster of the Lakeside School signed enrollment forms for Lakeside

17

School students.  Parents or guardians (other than those who happened to be the headmaster or assistant headmaster of a school), did not sign the enrollment forms and did not otherwise consent to the transfer of their children's identifying information to ACS.  As TREY HOLLADAY then knew, the students named in the ACS enrollment forms and the parents of those students did not intend to enroll as full-time public school students for the 2016-2017 school year.

u.  As noted, during the March of 2016 meeting, TREY HOLLADAY pledged that Athens Renaissance would only accept students who resided within an approximately 100-mile radius of Athens.  During the summer of 2016, TREY HOLLADAY caused ACS to open a facility in Linden—a location within 100 miles of Marengo Academy, Jackson Academy, Pickens Academy, and Southern Academy.

v.  During the summer of 2016, the superintendent of the Linden, Alabama City School System (hereinafter, "Linden City Schools") agreed to allow TREY HOLLADAY and ACS to access and use classroom space in an unused building under the custody and control of Linden City Schools.  TREY HOLLADAY, CARTER, and other ACS officials referred to this space as Athens Renaissance's "Linden Hub."  An ACS sign was placed in front of the Hub.

w.  In September of 2016, TREY HOLLADAY and CORKREN went to the central office of the Elba, Alabama City School System (hereinafter, "Elba City Schools") in Elba, Alabama.  There, they met with the superintendent, C.T.

18

x.  During the meeting, TREY HOLLADAY asked C.T. if Elba City Schools would be willing to serve as an additional "hub" for Athens Renaissance. Elba is within 100 miles of the Lakeside School in Eufaula. Linden, the location of ACS's Linden Hub, is not within 100 miles of the Lakeside School in Eufaula.

y.  TREY HOLLADAY offered that ACS could enter into contracts to pay both Elba City Schools and C.T. TREY HOLLADAY and CORKREN would not require C.T. or Elba City Schools to perform any service for ACS in exchange for receiving money from such contracts.

z.  On September 11, 2016, TREY HOLLADAY sent an email message to C.T. In the message, TREY HOLLADAY wrote: "We have approximately 150 students within 70 miles of Elba now and plan to add a couple of hundred more next year. So based on 150, you would receive $75,000 next year and if we added 200 more you would receive[ ]$175,000 in 2018-19."

aa. ACS did not ever make payments to Elba City Schools or to C.T. Elba City Schools did not serve as a hub for ACS during the relevant period.

bb. On October 14, 2016, officials with the ASDE, from ASDE offices in Montgomery, using wire communications in interstate commerce, caused to be extracted enrollment information from ACS's student information management database. The database reflected that full-time students of Marengo Academy, Jackson Academy, Pickens Academy, the Lakeside School, and Southern Academy had been enrolled as full-time ACS students for some or all of the 20-day period

following Labor Day of 2016.  In total, ACS's enrollment information included in excess of 750 full-time private school students.

cc. As TREY HOLLADAY then knew, these full-time private school students were, in no way, full-time virtual students of ACS.

dd. At the end of the fall 2016 and spring 2017 semesters, CARTER and CORKREN, at the direction of TREY HOLLADAY, caused the private schools to submit to CORKREN reports containing the grades earned that semester by the private school students in the private school courses.  CORKREN then provided those reports to CARTER.  CARTER then caused ACS officials to input the grades into ACS's student information database, as though the grades had been earned in virtual classes offered by ACS.

ee. In February of 2017, ASDE officials visited the physical campuses of Athens Renaissance.  They went to "audit" paperwork associated with Athens Renaissance students.

ff. In connection with the audit, TREY HOLLADAY instructed CORKREN to obtain private school parent signatures on ACS enrollment forms.  TREY HOLLADAY did so even though the private school officials had, for almost every student, already signed an ACS enrollment form and even though, at the beginning of the 2016–2017 school year, ACS had purported to enroll each student.

gg. Thereafter, CORKREN asked officials at the private schools whose students were fraudulently enrolled in Athens Renaissance to obtain, from the parents or guardians of their students, signed ACS enrollment forms.  In some instances,

CORKREN offered for Ed Op to pay and did pay a school a monetary amount for each parent-signed enrollment form the private school provided to him.   ACS reimbursed CORKREN for the payments Ed Op made to private schools in exchange for the parent-signed forms.

hh.  Private school officials then persuaded parents and guardians to sign ACS enrollment forms.  Private school officials caused the signed forms to be delivered to CORKREN, who then caused them to be delivered to CARTER.

ii.  TREY HOLLADAY acknowledges and agrees that, if the case went to trial, the government would prove that, in February of 2017, the headmaster of the Lakeside School sent a United States Mail package from Eufaula, Alabama to Northport, Alabama, where CORKREN resided.  Inside the package were ACS enrollment forms signed by parents.  The use of the mail was in furtherance of the scheme to defraud.

jj.  In the spring of 2017, TREY HOLLADAY contacted TUTT and invited TUTT to become a participant in the scheme.  TUTT's role was, initially, to contact private schools and recruit the private schools to participate in the scheme during the 2017–2018 school year.

kk.  TUTT agreed to participate.  Thereafter, at TREY HOLLADAY's direction, Ed Op formed an agreement with Tutt Educational, the company that TUTT formed for the purpose of participating in the scheme.

ll.  TREY HOLLADAY acknowledges and agrees that, if the case went to trial, the government would establish that payments were made during the 2016-2017 school

21

year as alleged in paragraphs 131 through 139 and 143 through 145 of the Indictment.

mm.    Before the beginning of the 2017–2018 school year, TREY HOLLADAY modified the scheme and caused the scheme to be modified in the following ways:

    i.   TREY HOLLADAY caused the following: (1) during the 2017–2018 school year, ACS and CCS would make monthly payments to Ed Op; (2) Ed Op would then make monthly payments to Tutt Educational; and (3) Tutt Educational would then make monthly payments to Sage.

    ii.   TREY HOLLADAY also directed CORKREN that Ed Op should begin making payments directly to private school employees so as to make it appear that private school employees were independent contractors of Ed Op.

nn. To make these changes, on June 28, 2017, TREY HOLLADAY sent an email message, using wire communications in interstate commerce, from his personal email account to CORKREN.  The subject of the message was "Stuff."  The message contained no text.  Attached to the message were four documents, namely:

    i.   A draft agreement between ACS and Ed Op for the 2017–2018 school year. The draft agreement called for ACS to pay Ed Op per month for each student serviced: (1) $60, if Ed Op did not provide services to the student during any part of the 2016–2017 school year; and (2) $200, if Ed Op did provide services to the student during any part of the 2016–2017 school

year.  The term of the draft agreement was to be from July 1, 2017 through September 30, 2018.

ii. A draft agreement between Ed Op and Tutt Educational.  The draft agreement called for Tutt Educational to "provide the Chief Executive Officer of Educational Opportunities and Management, LLC . . . with guidance, advise [sic], and assistance concerning various independent-virtual education projects, including innovative education initiatives, personnel management and nontraditional education delivery."  Under the draft agreement, Ed Op was to pay Tutt Educational: (1) a monthly payment of $16,500; (2) a student management and professional development fee of $16,500; (3) an internet connectivity fee of $10,000; (4) for 10 months, a site service monthly fee of $24,000; (5) if Ed Op did not provide Tutt Educational with laptop computers, then a single payment of $135,000; and (6) other approved expenses.  The draft agreement was to expire on June 30, 2018.

iii. A draft agreement between Tutt Educational and Sage.  The draft agreement called for Sage to provide "the Chief Executive Officer of Tutt Educational Services, LLC . . . with guidance, advise [sic], and assistance concerning professional development and teacher training."  Under the draft agreement, Tutt Educational was to pay Sage a monthly fee of $16,500.  The draft agreement was to expire on June 30, 2018.

23

      iv. A draft agreement template between Ed Op and a "contract teacher." The draft agreement template called for the teacher to provide "student instruction, grading, testing, counseling, reporting, and assistance concerning assigned virtual education students and nontraditional education delivery." Under the draft agreement template, Ed Op was to pay the teacher $200 per student assigned. This would come in two payments. These payments would be distributed on December 15 and May 31 "or upon receipt of the required reports provided to the CEO." The draft agreement template also stated: "Payment to the Teacher will not be distributed until grade reports are received."

oo. On August 17, 2017, the state superintendent of education sent a letter to TREY HOLLADAY. The letter stated that ASDE officials had learned, through contact with private school officials, that, "in exchange for enrollment and access to virtual content provided through Athens Renaissance School, the private school is offered a per student allotment as well as a laptop for each student enrolled." The state superintendent suggested that the enrollment of private school students was "in conflict with the Virtual School Law and call[ed] into question the legitimacy of a significant portion of the 2017 funded ADM [average daily membership] reported by ACS." At the conclusion of the letter, the state superintendent stated that the ASDE would "need to consider, among other things, an extrapolation of disallowed ADM [average daily membership] and corresponding consequences in funding."

pp. After receiving this letter, TREY HOLLADAY shared it with TUTT.  TREY HOLLADAY also discussed the matter, over the telephone and in person, with ASDE officials.  During conversations, TREY HOLLADAY insisted that all students purportedly enrolled in Athens Renaissance were taking full course loads through Athens Renaissance.  For example, on August 18, 2017, in an email message sent to a member of the Alabama board of education, TREY HOLLADAY wrote, "They are taking a full class load from us and we're educating them."  As TREY HOLLADAY then knew, this statement was false.

qq. During discussions with ASDE officials, TREY HOLLADAY learned that the ASDE had confirmed that, in the fall of 2016, ACS had included in its average daily membership report full-time students of the Lakeside School.  Accordingly, in August of 2017, TREY HOLLADAY instructed CORKREN to discontinue issuing payments to the Lakeside School and informed him that ACS would not be enrolling the Lakeside School students for the 2017–2018 school year.

rr. As part of an effort to convince ASDE officials that ACS had educated all of the private school students fraudulently enrolled in Athens Renaissance during the 2016–2017 school year, TREY HOLLADAY instructed CORKREN to obtain and to provide to ACS Odysseyware course completion reports for certain students of Marengo Academy and of the Lakeside School.  CORKREN understood this to mean that he should falsify such reports so that they would falsely reflect that the students were taking full course loads through Odysseyware.  The subject students had not taken full course loads through Odysseyware or any other curriculum

25

provided by ACS during the 2016–2017 school year and any reports reflecting that they had would be false documents. CORKREN then prepared such false reports and submitted them to CARTER.

ss. On November 17, 2017, CARTER sent an email message to the interim state superintendent of education and the deputy state superintendent of education for the division of administrative and financial services. CARTER copied TREY HOLLADAY on this email message. Attached to the email message were, among other things, 20 falsified Odysseyware course completion reports prepared by CORKREN. Each false report purported to show that the subject student (either a 2016–2017 full-time Lakeside School or Marengo Academy student) had taken a full course load through Odysseyware during the 2016–2017 school year. As CARTER and TREY HOLLADAY then knew, these documents were false. CARTER sent the documents to the ASDE officials for the purpose of causing the ASDE officials to authorize the issuance of full payment from the Education Trust Fund for the private school students fraudulently enrolled in Athens Renaissance during the 2016–2017 school year.

tt. On October 10, 2017, officials with the ASDE, from ASDE offices in Montgomery, using wire communications in interstate commerce, extracted enrollment information from ACS's student information management database. The database reflected that full-time students of Marengo Academy, Jackson Academy, Pickens Academy, and Southern Academy had been enrolled as full-time ACS students for some or all of the 20-day period following Labor Day of 2017. These full-time

private school students were, in no way, full-time virtual students of ACS.  During that school year, private school grades came to ACS as they had the previous school year and were loaded into ACS's student information database.

uu. During the summer of 2017, TREY HOLLADAY and CARTER began efforts to convert a portion of Athens Renaissance into a charter school.  They wanted Athens Renaissance to remain a virtual school of ACS serving only students who resided within Athens and nearby areas.  They wanted to create a new charter school that would serve students who resided outside of the area near Athens—including the private school students.  The name of this charter school would be Alabama Renaissance.

vv. On an unknown date, TREY HOLLADAY verbally explained to an ACS employee that if ACS were able to convert a portion of Athens Renaissance into a charter school that new charter school would be subject to less state oversight than Athens Renaissance.  During that conversation, TREY HOLLADAY said, when discussing the level of control ACS would have over a charter school it authorized, "We don't have to deal with the state; we, we run, we are the state department at that point in time."

ww.      Throughout the 2017-2018 school year, TREY HOLLADAY, CARTER, and others attempted to persuade private schools to: (1) dissolve their existing private schools; (2) reconstitute as non-profit homeschool associations; and (3) allow the students of the new homeschool associations to be enrolled in Alabama Renaissance.   The above-named co-conspirators explained to private school

27

officials that the effect of making these changes would be: (1) the new homeschool associations would be able to use virtual education curriculum; (2) the new homeschool associations would receive even more money from the state, through ACS and other entities, than they had been previously receiving (if the school had previously provided student information to ACS and received money for doing so); (3) the homeschool associations would still be able to collect tuition, in the form of "fees" or "donations," from students, would still be able to offer non-secular elective courses, would still be able to maintain brick-and-mortar campuses, and would otherwise still be able to, for the most part, function as they had as private schools.  Among the private schools contacted regarding this plan were: Marion Academy, Jackson Academy, Southern Academy, Meadowview Christian School, and Camden Christian Academy.

xx. During the 2016-2017 school year and the 2017-2018 school year, CARTER, at the direction of TREY HOLLADAY, arranged for standardized tests to be administered to the private school students.  ACS bore the expense for this testing. Such testing was required so as to make it appear to state officials that the private school students were actually public school students.

yy. TREY HOLLADAY acknowledges and agrees that, if the case went to trial, the government would establish that payments were made during the 2017-2018 school year as alleged in paragraphs 231 through 242 and 245 through 251 of the Indictment.

## VI. THE DEFENDANT'S WAIVER OF APPEAL AND COLLATERAL ATTACK

24.     Understanding that 18 U.S.C. § 3742 provides for appeal by a defendant of the sentence under certain circumstances, the defendant expressly waives any and all rights conferred by 18 U.S.C. § 3742 to appeal the conviction or sentence.  The defendant further expressly waives the right to attack the conviction or sentence in any post-conviction proceeding, including proceedings pursuant to 28 U.S.C. § 2255.  Exempt from this waiver is the right to appeal or collaterally attack the conviction or sentence on the grounds of ineffective assistance of counsel or prosecutorial misconduct.

25.     In return for the above waiver by the defendant, the government does not waive its right to appeal any matter related to this case, as set forth at 18 U.S.C. § 3742(b).  However, if the government decides to exercise its right to appeal, the defendant is released from the appeal waiver and may pursue any appeal pursuant to 18 U.S.C. § 3742(a).

## VII. BREACH OF THE PLEA AGREEMENT

26.     The parties agree that the issue of whether either party has breached this agreement at any time is one that will be resolved by the Court by a preponderance of the evidence, except as set forth in paragraph 27.  The parties agree that, should either party obtain information causing the party to develop a good faith belief that the other party has breached this agreement, then the party will promptly file a written motion—or make an oral motion if doing so would be more expedient—asking that the Court declare the other party to be in breach of the plea agreement.

27.     The parties agree that a breach of the plea agreement by the defendant would include, but not be limited to: (1) failing to fulfill each of the defendant's obligations under this plea agreement; (2) committing new criminal conduct; or (3) seeking to withdraw the guilty plea

or otherwise engaging in conduct inconsistent with an acceptance of responsibility. Should the Court find the defendant to have breached this agreement: (1) the government will be free from its obligations under this agreement; (2) the defendant will not be permitted to withdraw the guilty plea; (3) the defendant's obligations and waivers under this agreement will remain in full force and effect; (4) the defendant will be subject to prosecution for other crimes; and (5) the government will be free to use against the defendant, directly and indirectly, in any criminal or civil proceeding, all statements by the defendant and any information or materials provided by the defendant, including statements made during the plea hearing and all statements made by the defendant pursuant to proffer letters.

28.     The parties agree that, in the event that the defendant breaches this agreement by committing new criminal conduct, the government will be required to only establish probable cause to believe that the defendant committed a new criminal offense for the Court to find the defendant in breach of the plea agreement.

29.     The parties agree that, should the Court find the government in breach of this plea agreement, the defendant may cancel this agreement and thus be released from the appellate and collateral attack waivers. The parties further agree that a breach of the plea agreement by the government will not automatically entitle the defendant to withdraw the guilty plea and, if the defendant should seek to withdraw the guilty plea on the basis of such a breach, then the defendant will be required to file a motion pursuant to Rule 11(d), which the government could oppose.

## VIII.   THE DEFENDANT'S ACKNOWLEDGEMENTS

30.     The defendant acknowledges that the Court is neither a party to nor bound by this agreement. The defendant understands and acknowledges that, although the parties are permitted

to make recommendations and present arguments to the Court, the Court will determine the advisory Guidelines range and the sentence.  The defendant acknowledges that the defendant and the defendant's attorney have discussed the advisory Guidelines and the statutory sentencing factors set forth at 18 U.S.C. § 3553(a) and the defendant understands how those provisions may apply in this case.  The defendant further understands that the defendant will have no right to withdraw a guilty plea on the basis that the Court calculates an advisory Guidelines range that differs from the range projected by the defense attorney or the government.

31.     The defendant acknowledges that the defendant authorized and consented to the negotiations between the government and the attorney for the defendant that led to this agreement.

32.     The defendant understands that: (1) in pleading guilty, the defendant may be required to make statements under oath; and (2) the government has a right to use against the defendant, in a prosecution for perjury or for making a false statement, any statement that the defendant makes.  However, as the defendant understands, the government may not use as evidence against the defendant in any future proceeding involving the charges alleged in the Indictment or related offenses, the defendant's guilty plea if the Court permits the defendant to withdraw that guilty plea.

33.     The defendant understands that if the defendant pleads guilty pursuant to this agreement and the Court accepts that guilty plea, the defendant will waive certain rights, namely: (1) the right to plead not guilty or to persist in a plea of not guilty; (2) the right to a jury trial; (3) the right to be represented by counsel—and if necessary to have the Court appoint counsel—at trial and at every other stage of the proceeding; and (4) the right at trial to confront and cross-

31

examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

34.     The defendant understands: (1) the nature of each charge to which the defendant is pleading guilty; (2) the maximum and minimum possible penalties associated with each charge to which the defendant is pleading guilty, including imprisonment, fine, and a term of supervised release; (3) any applicable mandatory minimum penalty associated with a charge to which the defendant is pleading guilty; (4) any applicable forfeiture provision applicable to a charge to which the defendant is pleading guilty; (5) the Court's authority to order restitution; and (6) the Court's obligation to impose a special assessment.

35.     The defendant confirms that the entirety of any agreement between the defendant and the government is set forth in this agreement and any addendum to this agreement and that the government has not made any promises to the defendant other than those contained in this agreement and any addendum to this agreement.  This agreement consists of 33 pages and 40 paragraphs and an addendum.

36.     The defendant confirms that counsel has competently and effectively represented the defendant throughout the proceedings leading to the entry of a guilty plea.  The defendant is satisfied with such representation.

37.     The defendant acknowledges that the defendant enters this plea agreement and pleads guilty freely and voluntarily.  That is, the defendant acts without being influenced by any threats, force, intimidation, or coercion of any kind.

38.     The defendant understands that this agreement binds only the Office of the United States Attorney for the Middle District of Alabama and that the agreement does not bind any other

component of the United States Department of Justice, nor does it bind any state or local prosecuting authority.

## IX. THE ATTORNEYS' ACKNOWLEDGEMENTS

39.     The attorneys for the government and for the defendant acknowledge that this plea agreement contains the entirety of any agreement between the parties and that the parties reached this plea agreement in accordance with the procedure set forth at Rule 11.

40.     The attorney for the defendant confirms that the attorney for the defendant advised the defendant of: (1) the nature of the charges to which the defendant is pleading guilty; (2) the penalties associated with those charges; (3) the rights that the defendant is waiving by pleading guilty; and (4) the possibility that statements made by the defendant under oath during a plea hearing may be used against the defendant in a subsequent prosecution for perjury or for making a false statement.

This _13th_ day of _December_ 2021.

Respectfully submitted,

_____
VERNE H. SPEIRS
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY CONFERRED
BY 28 U.S.C. § 515

_____
Jonathan S. Ross
Assistant United States Attorney

_____
Alice S. LaCour
Assistant United States Attorney

_____
Brett J. Talley
Assistant United States Attorney

33

William L. Holladay, III
Defendant

William M. Espy
Attorney for the Defendant